**In re LEE WAY HOLDING COMPANY, Debtor.**

**Bankruptcy No. 2–85–00661.**

United States Bankruptcy Court, S.D. Ohio, E.D.

Oct. 16, 1990.

Frederick M. Luper, Columbus, Ohio, Chapter 11 Trustee.

Robert J. Sidman, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for Official Creditors Committee.

Darryl M. Bradford, C. Steven Tomashefsky, Donald R. Harris, Jenner & Block, Chicago, Ill., John Winship Read, Vorys, Sater, Seymour & Pease, Cleveland, Ohio, for Chapter 11 Trustee.

Russell A. Kelm, Nelson E. Genshaft, Schwartz, Kelm, Warren & Rubenstein, Columbus, Ohio, Roger Pascal, Ann Rae Heitland, Duncan G. Harris, Schiff, Hardin & Waite, Chicago, Ill., for PepsiCo, Inc.

Leon Friedberg, Benesch, Friedlander, Coplan & Aronoff, Columbus, Ohio, Thomas D. Yannucci, Rick Richmond, Joyce Bernstein, Kirkland & Ellis, Washington, D.C., for Banner Industries, Inc.

Thomas E. Lodge, Thompson, Hine & Flory, Columbus, Ohio, for Fidelcor.

Dennis R. Wilcox, Climaco, Climaco, Seminatore, Lefkowitz & Garofolo, Cleveland, Ohio, for Creditors Comm.

Roy E. Crowe, Sr., Smyrna, Ga.

Ronald L. Castle, Arent, Fox, Kintnr, Plotkin & Kahn, Washington, D.C., for Central States.

## ORDER ON MOTION FOR APPROVAL OF SETTLEMENT OF BANNER ADVERSARY

DONALD E. CALHOUN, Jr., Bankruptcy Judge.

This cause came on for hearing commencing April 25, 1990, to consider the Trustee's Motion for Approval of Settlement of Banner Adversary, and objections thereto by PepsiCo, Inc. ("PepsiCo"), the Central States, Southeast and Southwest Areas Health and Welfare and Pension Funds ("Central States"), and Roy E. Crowe, Sr. Documents No. 2036, 2037 and 2038, respectively.[1] Present at the hearing were counsel for the Trustee and each of the objecting parties except Mr. Crowe. Also, present at the hearing were counsel for the Official Committee of Unsecured Creditors ("Creditors' Committee"), and Banner Industries, Inc. and Plymouth Leasing Company (collectively "Banner"). After five extended days of testimony and other evidence, and one day of oral argument on various legal and procedural issues, the Court requested briefs and proposed findings of fact, which have been filed.[2] The Court also allowed supplementation of the record which the parties took advantage of. All exhibits were deemed admitted, except that at Tab E of Banner's

Reply Brief, which was previously stricken. *See* Document No. 2328.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the General Order of Reference in this District. This is a core proceeding under 28 U.S.C. § 157(b)(2).

## I. INTRODUCTION

Pursuant to Bankruptcy Rule 9019, the Trustee seeks approval of a global settlement resolving all existing and potential disputes between the bankruptcy estate and Banner. The majority of these disputes are reflected in the adversary proceeding of *Luper v. Banner Industries, Inc.*, Adv.Pro. No. 2–86–0343, pending before this Court ("Banner adversary"). The settlement also encompasses a potential cause of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, which PepsiCo asserts is held by the estate. On March 29, 1990, the Trustee filed his Motion with the Settlement Agreement attached, and served it upon all parties on the Master Notice Matrix, in accordance with the Court's Case Management Order entered in this case.[3] Also, on March 29, 1990, the Trustee filed and served on all creditors a Notice of Hearing of Motion for Approval of Settlement of Banner Adversary Proceeding, describing the compromise and giving notice of the hearing to be held by the Court.[4] The evidentiary hear-

1. Usage of the term "Document No. ____" shall refer to the number assigned to a filed pleading or other document as it appears on the docket card for Lee Way Holding Co., maintained by the Clerk of the Court.

2. PepsiCo and Banner also filed Objections to Proposed Findings of Fact submitted by the Trustee and PepsiCo, respectively, which Objections were not solicited by the Court or suggested by the parties. It is clear that these "Objections" were an effort to supplement the Briefs which were limited to 50 pages. Surprisingly, however, the unsolicited briefing did not engender any motion to strike or other objection by parties-in-interest.

3. The Master Notice Matrix includes all members of the Creditors' Committee, the Debtor, their counsel and all attorneys which have filed a Notice of Appearance.

4. Pursuant to the Case Management Order, the Trustee noticed the hearing for April 18, 1990, at 10:00 a.m. However, PepsiCo filed an Emergency Motion for Expediting Discovery and Continuing Hearing. After an expedited hearing was held thereon on April 11, 1990, and in recognition of the substantial amount of time that the Trustee's Motion for Settlement would take, the hearing was rescheduled for April 25, 1990, at 9:30 a.m. See Document No. 2045 [Order on Emergency Motion ..., entered April 18, 1990.] Since the Trustee had served on all creditors with the Notice of Hearing on his Motion, the matter was called at the Status Conference held on April 18, 1990, at which time the Court announced to all parties in interest that the evidentiary hearing would commence on April 25, 1990.

ing began on April 25, 1990, and continued on April 26, 1990, May 15 and 16, 1990, and May 21 and 22, 1990.[5] Central States withdrew its objection to the settlement on July 10, 1990. Document No. 2148.

## II. BACKGROUND AND FINDINGS OF FACT

From the record and the evidence presented, the Court finds and concludes as follows:

The Debtor, Lee Way Holding Company, (the "Debtor" or "Lee Way") emerged from the merger of Lee Way Motor Freight, Inc. ("LWMF") and Commercial Lovelace Motor Freight, Inc. ("CLMF") on February 27, 1985. CLMF had been a wholly-owned subsidiary of Banner Industries, Inc. until approximately March 1, 1983, when Banner transferred approximately 51% of its stock to an Employee Stock Ownership Plan (the "ESOP"). LWMF had been a wholly-owned subsidiary of PepsiCo until approximately June 5, 1984. On June 5, 1984, CLMF acquired the stock of LWMF. After the merger, the Debtor filed a Petition for Relief under Chapter 11 of the Bankruptcy Code on March 7, 1985. Frederick M. Luper, an experienced trustee in this district, Transcript pp. 850–854, was appointed the Chapter 11 Trustee in January, 1987.

Allegedly, some of the largest assets of this bankruptcy estate consist of various claims against Banner, which gave rise to one of the major adversary proceedings filed during this Chapter 11 case. *Luper v. Banner Industries, Inc.*, Adv.Pro. No. 2–86–0343 ("the *Banner* adversary").[6] The First Amended Complaint and Objections to Claims of Banner (the "Complaint"), Plaintiff's Exhibit 1,[7] filed by the Trustee on or about November 17, 1987, is a 33–page

Complaint consisting of 13 claims for relief. The Trustee classifies most of the claims in four general categories:

(a) Alter-ego and/or turnover—through which the Trustee seeks to incorporate Banner assets into the bankruptcy estate and/or hold Banner liable for all debts of the estate;

(b) Fraudulent conveyances—through which the Trustee seeks to avoid transfer of property by the Debtor to Plymouth Leasing Co. prior to commencement of the Chapter 11 case;

(c) Preferential transfers—through which the Trustee seeks to recover preferential payments made to or for the benefit of Banner; and

(d) Tax–Sharing Agreement—through which the Trustee seeks to recover amounts due under certain agreements by and between CLMF and Banner.

Additionally, the Trustee objects to Banner's claims against the estate or in the alternative, requests subordination of Banner's claims. Banner responded to the Complaint, raising several affirmative defenses, and asserting numerous counterclaims. Among the counterclaims, Banner asserts a security interest in assets of the estate, including accounts receivable, and seeks a determination of the extent and validity of its interest in those assets. Banner further asserts claims against the estate for amounts paid on claims against the Debtor pursuant to personal guaranties, letters of credit and the like.

The acquisition of LWMF by CLMF and the subsequent merger has engendered a truly phenomenal amount of litigation in various forums. Some of this litigation is germane to the issues now before the

---

**5.** Initially, PepsiCo strenuously objected to the trial schedule. However, at a telephonic hearing held on May 10, 1990, at the instance of the Trustee's counsel to request a continuance, counsel for PepsiCo indicated that they had overcome the difficulties imposed by the trial schedule and stated that they were "ready to go". *Cf.* PepsiCo Memorandum p. 18 n. 11.

**6.** This and several other adversary proceedings, including one against PepsiCo, were filed by the

Debtor-in-Possession or the Creditors' Committee prior to appointment of the Trustee. When Mr. Luper became Trustee, he naturally stepped in as plaintiff.

**7.** The Trustee's counsel labeled their exhibits as "Plaintiff's Exhibit ____." Although inaccurate, the Court has continued usage of this nomenclature to avoid confusion.

Court, and the major cases can be summarized as follows:

(a) *The St. Paul litigation (St. Paul Fire & Marine Insurance Co. v. PepsiCo, Inc.,* Case No. 35 Civ. 2276 (KTD)). This case was initiated by St. Paul Fire & Marine Insurance Company against PepsiCo in the United States District Court for the Southern District of New York, based upon an indemnity agreement executed by PepsiCo in favor of St. Paul in 1978. In reliance upon that agreement, St. Paul had executed various surety bonds on behalf of LWMF to cover various liabilities. Upon default of those claims by LWMF, claims were made against the bonds issued by St. Paul. PepsiCo's Third–Party Complaint sought to pierce the corporate veil under an "alter-ego" theory, and compel Banner to indemnify PepsiCo for any amount found due to St. Paul. After discovery, Banner moved for summary judgment on the ground that Banner was not CLMF's alter-ego and that PepsiCo could not raise any genuine issue of material fact to the contrary. On November 2, 1988, the District Court granted Banner's Motion for Summary Judgment on the merits, and dismissed PepsiCo's Third–Party Complaint. *See* Plaintiff's Exhibit 9. On appeal, the United States Court of Appeals for the Second Circuit affirmed the dismissal, on the grounds that PepsiCo lacked standing to assert an alter-ego claim against Banner. The Second Circuit further noted that, in light of the pending Chapter 11 reorganization case, the causes of action asserted by PepsiCo belong to the bankruptcy trustee. *See* Plaintiff's Exhibit 10 [*St. Paul Marine Insurance v. PepsiCo, Inc.,* 884 F.2d 688, 707 (2d Cir.1989)].

(b) *The Courtney litigation (Banner Industries, Inc. v. PepsiCo, Inc.,* Case No. CIV 85–449–R). This case was initially commenced against CLMF by an individual named Courtney. The procedural history of this case, which is pending in the United States District Court for the Western District of Oklahoma, is extremely complex. At present, the remaining issues involve claims by Banner against PepsiCo in which Banner asserts that it is CLMF's subrogee and alleges that PepsiCo committed fraud in selling LWMF to CLMF. PepsiCo's affirmative defenses include claims that are essentially the same as the Trustee's alter-ego claim here, i.e. that Banner dominated and controlled CLMF in a fashion which caused CLMF's financial failure. Since the disputes between Banner and PepsiCo are the only issues remaining, the case was renamed. The case was set for trial in April 1990, but was continued upon the filing of a motion for summary judgment by PepsiCo.

(c) *The RICO litigation (PepsiCo, Inc. v. Banner Industries, Inc.,* Civil Action C–2–86–1571). This case is a civil RICO action brought by PepsiCo against Banner and various other defendants in the United States District for the Southern District of Ohio. On September 15, 1989 and January 8, 1990, Magistrate Abel recommended that the case be dismissed for lack of standing. *See* Plaintiff's Exhibits 13 and 14. However, Magistrate Abel did find that PepsiCo's Second–Amended Complaint stated a cause of action upon which relief could be granted.[8] Plaintiff's Exhibit 13, pp. 12–16. He further surmised that the Trustee has standing to assert the RICO claims. Plaintiff's Exhibit 13, p. 30; Plaintiff's Exhibit 14, p. 16.

(d) *The Banner/Central States arbitration. (In the Matter of Arbitration between Banner Industries, Inc. and Central States, Southeast and Southwest Areas Pension Fund,* AAA Case No. 51 621 0014 87 V). In 1986, the Central States, Southeast and Southwest Areas Pension Fund sent a notice and demand for payment of approximately $20,000,-000 to Banner pursuant to the Multi–Employer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. § 1381 *et seq.* Banner disagreed with the assessment and filed suit in the United States District Court for the Northern District of Illinois, seeking a declaratory judgment

---

**8.** On April 11, 1990, PepsiCo filed a Third-Amended Complaint. *See* PepsiCo Exhibit 150.

determining liability. On March 25, 1987, the District Court directed Banner to submit the dispute to the American Arbitration Association. On January 22, 1989, an arbitrator issued a decision holding Banner liable. *See* Plaintiff's Exhibit 12. Although proceedings before the arbitrator to determine the amount of liability were still pending at commencement of the hearings on the Trustee's Motion to Settle, the disputes between Banner and Central States were subsequently settled.[9]

The above-described litigation, all of which relates to the demise of Lee Way in some fashion, has been exceptionally acrimonious and contentious. In connection with the various litigation, PepsiCo has accumulated approximately 340 days of deposition transcripts and 400,000 documents. PepsiCo has expended approximately $13,000,000 in professional fees, including defense of the estate's claims against PepsiCo, prosecution of the PepsiCo claims against the estate, defense of claims by Central States against PepsiCo, defense of Worker's Compensation claims, PepsiCo's motions to disqualify various counsel for the Debtor.

Of the funds collected for the estate during his tenure, after deduction of expenses of the fees awarded by the Court, the Trustee is holding approximately $4,092,173. Document No. 2329 [Trustee's Forty-fourth Accounting, filed September 26, 1990]. Of this amount, the Trustee is holding in escrow the sum of $1,072,172 pursuant to Order of Court entered by virtue of Banner's asserted security interest. As of October 1, 1990, there are pending before the Court fee applications requesting $735,066 in the aggregate, for services rendered

through August 31, 1990.[10] It is largely out of this fund that the Trustee must finance existing litigation being conducted on behalf of the estate. In addition to myriad smaller adversary proceedings, there are several large complex adversary proceedings being prosecuted by the Trustee against PepsiCo, Home Insurance Company, and Fred R. Langley, et al.

## III. THE PROPOSED SETTLEMENT

The settlement agreement provides that Banner will pay the estate, when all appeals have been exhausted, $6,000,000 in cash. From the date that the Bankruptcy Court approves the settlement, that sum will accrue interest at the statutory rate under 28 U.S.C. § 1961. The principal and interest will be secured by an irrevocable letter of credit, which shall be renewed annually. Banner will release all of its claims against the estate, including administrative claims and subrogated claims, and will release any and all security interests in assets of the estate. This includes an asserted security interest in $1,000,000 of the estate's cash. Banner will indemnify the estate for claims against the estate by entities whose claims Banner has guaranteed, including but not limited to claims of Ohio Worker's Compensation Bureau (approximately $5,400,000) and Central States (approximately $20,000,000). Under this indemnification, Banner will pay any amounts which the estate would otherwise be required to pay from the pool of funds available for distribution to the unsecured creditors, thus increasing the dividend to other unsecured creditors.

In exchange for these concessions, the estate will dismiss its adversary proceeding

---

**9.** Interestingly, Central States also made demands against PepsiCo and affiliated entities for withdrawal liability under MPPAA as a result of LWMF's failure to make pension plan contributions. This demand also was the subject of several lawsuits. On May 26, 1987, PepsiCo agreed to settle the matter by payment of $24 million to Central States; inasmuch as PepsiCo had been required to make interim payments of almost $35 million, the settlement resulted in a refund by Central States to PepsiCo in the amount of approximately $14 million. *See* Banner Exhibit B–2.

**10.** These fee applications consist of Mr. Luper's Application for Trustee's allowance requesting $15,625; Mr. Luper's tenth fee application requesting $107,133; Vorys, Sater, Seymour & Pease's fourteenth fee application requesting $274,968; Vorys, Sater, Seymour & Pease's fifteenth fee application requesting $158,196, and Jenner & Block's ninth fee application requesting $179,144.

against Banner, and execute a general release of Banner, its directors, officers, employees, and representatives. *See* Plaintiff's Exhibit 5.

## IV. ADEQUACY OF NOTICE & HEARING

### A. *Notice*

On March 28, 1990, the Trustee sent a Notice of Hearing of Motion For Approval of Settlement of Banner Adversary Proceeding to all creditors on the Matrix maintained by the Clerk of the Court, which exceeded 15,000 in number.[11] Plaintiff's Exhibit 6. The Notice contained a full description of the Banner adversary, the history of the case, and a summary of the terms of the Settlement Agreement. PepsiCo objected to the Notice on several grounds, some of which truly can be relegated to the "kitchen sink" category. Among PepsiCo's objections:

(a) The Trustee failed to comply with Bankruptcy Rule 9007 in that the Trustee failed to obtain judicial approval of the form, content, method, timing and period for objections;

(b) The Notice failed to give adequate notice of the time period for objections in that it (i) was undated but stated that there were twenty days from the date of the Notice in which to object, and (ii) indicated that, in any case, objections must be filed no later than three days before the hearing, which date fell on Sunday;

(c) The type-face of the Notice was small and single-spaced, making it difficult to read;

(d) The Notice was folded, stapled and mailed without an envelope, and containing no indication on the outside of its importance, that it related to a bankruptcy court or bankruptcy case, or that the information contained may impact claims;

(e) The Notice failed to indicate that parties in interest could contact the Trustee, or how to contact the Trustee;

(f) The Notice failed to contain information regarding (i) the impact of the settlement on dividends to creditors, (ii) PepsiCo's objections to the settlement, opinion of the case or level of familiarity of the facts, and (iii) details surrounding the Creditors' Committee's approval of the settlement and level of familiarity with the case.

In support of some of its objections to the Notice, PepsiCo submitted the testimony of Thomas Raleigh, an attorney who serves as a Bankruptcy Trustee in the Northern District of Illinois.

■ The Court finds PepsiCo's objections in large measure spurious. Contrary to PepsiCo's assertion, the Notice was sufficient under the Bankruptcy Code and Rules. Bankruptcy Rule 9007 governs the Court's general authority to regulate notices; the Rule provides in pertinent part:

> When notice is to be given under these Rules, the Court shall designate, *if not otherwise specified herein,* the time within which, the entities to whom, and the form and manner in which notice shall be given. (Emphasis supplied.)

Bankruptcy Rule 2002 specifically addresses notice of compromises, stating in pertinent part:

> (a) Twenty-day notices to parties-in-interest. Except as provided in subdivisions (h), (i), and (k) of this Rule, the clerk, or some other person as the Court may direct, shall give the debtor, the trustee and all creditors and indenture trustees not less than 20 days notice by mail of ... (3) the hearing on approval of a compromise or settlement of a controversy, unless the Court for cause shown directs that notice not be sent ...

Clearly, Bankruptcy Rule 2002 specifies the notice required to be given. The fact that practitioners and trustees in the Northern District of Illinois may seek judicial approval of a notice of a compromise or settlement is irrelevant given the specificity of Bankruptcy Rules 9007 and 2002. Further, Mr. Raleigh indicated that his experience spans only the practice in the Northern District of Illinois. He did not purport to

---

11. The Trustee effectuated such broad notice even though paragraph 4 of the Case Management Order, Document No. 55, requires notice only to the parties on the Master Notice Matrix.

explain or discuss in his testimony the prevailing practice nationwide. Transcript p. 1634. Additionally, it is not the practice in this division of the Southern District of Ohio, to obtain judicial approval, although cases of sophistication and significance have been filed and prosecuted here.

■ PepsiCo's objection to the language in the Notice of the time period within which to object is similarly strained. Although the Court would have preferred that the Notice be dated, since the time period within which to object was tied to that date, the Trustee's failure to do so is not fatal. PepsiCo's objection emphasizes that the language of the Notice is such that it does not give creditors a specific or clearly ascertainable date by which objections must be filed. However, PepsiCo underestimates the ability of the common creditor. Although Roy Crowe was lacking in the legal expertise and knowledge necessary to file a legally cognizable objection, he evidently understood the language of the Notice sufficiently to timely file his objection. Notwithstanding the language of the Notice, no objections were untimely filed, and the Court has received no complaints, other than PepsiCo's, to the language or the time period available within which to object.[12] *See also In re Martin–Trigona,* 781 F.2d 36 (2d Cir.1986) (settlement proceeding allowed to proceed *without* notice to creditors where none had appeared on previous settlement hearings).

■ The Court views similarly PepsiCo's objections to the typeface and spacing of the Notice, as well as the method of mailing and the lack of information on the outside of the Notice. There is no rule and PepsiCo has cited no case law for the proposition that these elements are necessary or important in the noticing process. The Court has reviewed the Notice and finds that it is clearly legible and understandable. It is easy to recognize why the format of the Notice was chosen: The Notice was sent to 15,000 parties-in-interest at great cost to the estate. To utilize doublespacing or a more standard size type would have greatly increased the number of pages to be copied and mailed, which would increase the costs of postage and possibly the time within which the Creditors would have received the Notices.

PepsiCo's next objection is that the Notice fails to indicate that the parties could contact the Trustee or how to contact the Trustee. As with the previous objections, there is no rule or case law cited for the proposition that this is required. In any case, PepsiCo's statement is patently untrue; the addresses and telephone numbers of the Trustee and his counsel (Jenner & Block) are clearly given at the bottom of the Notice immediately below the signature of one of the Trustee's attorneys, and the Notice specifically identifies Frederick M. Luper as the Chapter 11 Trustee and Jenner & Block as his counsel.

■ Finally, PepsiCo objects to the Trustee's failure to incorporate information regarding the impact of the settlement on dividends, the objections by PepsiCo, PepsiCo's opinion of the Banner adversary, and level of familiarity with the facts, the details surrounding the Creditors' Committee's approval of the settlement and the Creditors' Committee's familiarity with the case. The Court finds these details to be more than what is required or advisable in any notice. A notice under Bankruptcy Rule 2002 is not intended or required to fully explain the circumstances of the case, the objections to a settlement, the circumstances surrounding settlement, or other details. PepsiCo should remember that this is a Notice, not a case history. *See Maher v. Zapata Corp.,* 714 F.2d 436, 451 (5th Cir.1983). Furthermore, the Notice specifically stated that copies of the Trustee's Motion and the proposed settlement

---

**12.** Interestingly, the Case Management Order provides and filed motions customarily indicate that objections must be filed no later than three days prior to the status hearing at which the subject pleading will be heard. The status hearings in this case have been held on Wednesday virtually since this case was commenced in 1985. However, never before has PepsiCo objected to such language setting forth the objection period, although such a deadline falls on Sunday.

agreement could be obtained from the Trustee's counsel.

In short, the Court is satisfied that the Notice provided by the Trustee was adequate.

## B. *Hearing.*

■ Although PepsiCo objected vehemently to the scheduling of the hearing, claiming that it was too expedited in light of the gravity of the settlement, the Court is of the opinion that sufficient time was given to prepare for the hearing and for the hearing to be conducted. As indicated above, the hearing was conducted over a period of six days spread out over six weeks, and was concluded only after the parties indicated that nothing further was to be presented. *See Martin–Trigona,* 781 F.2d at 38. PepsiCo knew by March 20, 1990 at the latest that the Trustee intended to enter into a settlement agreement with Banner, PepsiCo Memorandum p. 22, and could have begun preparations.[13] In addition, as PepsiCo readily admits, PepsiCo is far more familiar with the claims against Banner than any other party-in-interest. Transcript, pp. 21–22; PepsiCo's Post–Hearing Memorandum p. 16. *See Matter of Texas Extrusion Corp.,* 844 F.2d 1142, 1161 (5th Cir.1988); *In re International Distrib. Centers, Inc.,* 99 B.R. 529 (S.D.N.Y.1989). Finally, as indicated above, PepsiCo expressly stated its readiness to proceed with the hearing during the telephone conference held on May 10, 1990.[14]

## V. STANDARDS FOR APPROVAL OF COMPROMISE

### A. *The Drexel Factors*

■ The Code does not set forth any parameters with which a Trustee is to be guided in evaluation or negotiation of a settlement. Courts, therefore, have structured guidelines for evaluation of a settle-

ment. "The benchmark for determining the propriety of a bankruptcy settlement is whether the settlement is in the best interests of the estate." *In the Matter of Energy Cooperative, Inc.,* 886 F.2d 921 (7th Cir.1989); *Martin v. Kane (A & C Properties ),* 784 F.2d 1377 (9th Cir.), *cert. denied sub nom., Martin v. Richardson,* 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986). The seminal case in this area is *Drexel v. Loomis,* 35 F.2d 800 (8th Cir.1929), which established the following criteria:

(a) The probability of success in the litigation;

(b) The difficulties, if any, to be encountered in the matter of collection;

(c) The complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it;

(d) The paramount interests of the creditors and a proper deference to their reasonable views in the premises. *Drexel,* 35 F.2d at 806. *See also, Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). Note, however, that the Court's role is not to conduct a trial or "mini-trial," or to decide the merits of individual issues. Rather, the Court's role is to determine whether the settlement as a whole is fair and equitable. *TMT Trailer,* 390 U.S. at 424, 88 S.Ct. at 1163; *Energy Cooperative,* 886 F.2d at 927 n. 6; *Cosoff v. Rodman (In re W.T. Grant Co.),* 699 F.2d 599, 608 (2d Cir.1983). The more complex and novel the subject litigation is, the less thorough a factual record is necessary to obtain approval of a settlement which will substantially benefit the bankruptcy estate. *In re Hancock–Nelson Mercantile Co., Inc.,* 95 B.R. 982, 993 (Bankr.D.Minn.1989). Uncertainty in the law is a factor which commends a compromise to the court's discretion. *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.) *cert. denied sub nom., Benson v.*

---

**13.** PepsiCo had known since December that Banner and the Trustee were engaged in settlement negotiations.

**14.** Although PepsiCo weakly attempts to overcome this inopportune remark, PepsiCo's Memorandum p. 18 n. 11, PepsiCo's remarks are

unpersuasive, particularly in light of its failure to refute the Court's remarks regarding PepsiCo's preparedness during the fairness hearing. Transcript p. 1377. Under these circumstances, the adequacy of the opportunity for hearing on this matter is incontrovertible.

*Newman,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972). While the Court is to give deference to the reasonable views of creditors, objections do not rule. It is well established that compromises are favored in bankruptcy. 9 *Collier on Bankruptcy* para. 9019.03 (15th ed. 1989). As the Supreme Court noted in *TMT Trailer,* 390 U.S. at 424, 88 S.Ct. at 1163:

> In administering reorganization proceedings in an economical and practical manner, it will often be wise to arrange the settlement of claims to which there are substantial and reasonable doubts.

### B. *The Trustee's Duty*

 PepsiCo, citing several cases, attempts to convince the Court that the Trustee must independently determine that the settlement is in the best interests of the estate. It appears that PepsiCo is implying that the Trustee must be as familiar and well-versed in the legal intricacies of the case as is his counsel. The Court is not satisfied that this is the meaning or intent of the cases which have been cited by PepsiCo. Further, if such were the case, all trustees would have to be attorneys who could fully understand legal theories, procedures, etc. Clearly, this is not the case. Rather, the Court is of the opinion that the Trustee may rely on his counsel and his counsel's judgment in reaching a determination whether or not to proceed with a settlement agreement. PepsiCo's expert, Tom Raleigh, admitted that this is appropriate. Transcript pp. 1593–94. Similarly, the Court itself may rely upon the opinions of counsel. *Pettway v. American Cast Iron Pipe Company,* 576 F.2d 1157, 1215, *reh'g denied,* 581 F.2d 267 (5th Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979) (subsequent history omitted); *Flinn v. FMC Corporation,* 528 F.2d 1169, 1173 (4th Cir.1975) *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976).

### VI. ADEQUACY OF THE PROPOSED SETTLEMENT

 The Court will first address the *Drexel* factors seriatim, and follow with the various other issues raised by PepsiCo.

### A. *Probability of Success on the Merits*

The probability of success on the merits is the first, and according to PepsiCo the foremost element of the review to be conducted by the Court. This element received the most attention from the parties, especially with regard to the alter-ego claim of the Complaint and RICO cause of action allegedly owned by the bankruptcy estate. Even PepsiCo's expert, Mr. Raleigh, admitted that assessing this factor of the *Drexel* test is an imprecise endeavor. Transcript p. 1602; Raleigh Deposition pp. 173–174. For purposes of discussion, the Trustee divided the melange of claims into the following categories: (a) alter-ego liability; (b) RICO claims; (c) tax-sharing funds; (d) fraudulent conveyances; and (e) preferential transfers. PepsiCo focused on the alter-ego and RICO claims, and chose to forego the opportunity to comment on the others. The Trustee estimated that potential recovery under the Complaint, together with any RICO cause of action, ranges from $4,050,000 to $5,250,000. These figures were based largely on the potential recovery for the tax-sharing funds, avoidance of fraudulent conveyances, and recovery of preferential transfers. Nonetheless, with the threat of the alter-ego and potential RICO claims, the Trustee obtained from of Banner a settlement of $6,000,000 in cash, plus the various other concessions discussed above.

1. The Tax Sharing Funds, Preferential Transfers and Fraudulent Conveyances.

Each of the claims based on the tax-sharing funds, the fraudulent conveyances and preferential transfers are factually and legally complex and are hotly contested. Banner has expended great time and energy at each step of the adversary proceeding. After discovery, the Trustee has determined that there are significant defenses and uncertainty to the outcome of each claim.

The Trustee initially asserted that Banner owes the bankruptcy estate approxi-

mately $3,800,000 pursuant to the Tax-Sharing Agreement, as amended, between Banner and CLMF. Pursuant to the Agreement, Banner and CLMF filed consolidated tax returns, and Banner is liable to the estate in an amount equal to the tax benefits Banner received by using CLMF's net operating losses. However, no money is due to the estate until the net operating losses are actually used, and Banner has asserted that it has not used any of the losses because it has losses of its own to use first. Additionally, Banner's estimated tax benefit of $3,800,000 was calculated in 1985 based on the corporate tax rate in effect at that time. By the time Banner uses the losses, if ever, the benefit will be reduced due to the presently reduced corporate tax rate. Furthermore, Banner advanced $500,000.00 to CLMF prior to the commencement of the Chapter 11 case, which must be offset against any amounts owed by Banner to the estate. Banner has also asserted the right of offset of other obligations owed to Banner by CLMF. In light of the circumstances, the Trustee has estimated the maximum recovery is $2,000,000. Transcript p. 113.

The claims for recovery of fraudulent conveyances are based on transfers of certain trucking terminals to Plymouth Leasing for less than fair market value. It initially appeared that the estate could recover approximately $2,000,000; however, it appears that the appraisals on which the claims are based may have been inaccurate, as Banner has not been able to sell the terminals at the appraised value. Therefore, the Trustee believes the potential recovery to fall within the range of $1,300,000 to $2,000,000. Transcript p. 126. With respect to the preferential transfers, Banner has raised the "ordinary course of business" and "contemporaneous exchange" defenses set forth in § 547(c)(1) and (2) of the Bankruptcy Code. After discovery on the facts, the Trustee has determined that the potential range of recovery falls between $750,000 and $1,250,000. Transcript p. 103.

PepsiCo has not attacked the Trustee's testimony or analysis of these claims, and the Court is satisfied that the Trustee's analysis is valid.

### 2. Alter-ego Claim and Potential RICO Cause of Action.

#### a. *The Alter-ego Claim*

In connection with the alter-ego claims (the First and Second Claims for Relief in the Complaint), the Trustee's counsel articulated four categories of obstacles or problems which the estate must overcome in order to succeed on the merits in the Banner adversary: (a) the Trustee's standing, (b) Banner's liability, (c) damages, and (d) practical problems. PepsiCo, of course, denied the existence of or truncated each of the Trustee's perceived obstacles as well as raising other general objections. Sadly, however, PepsiCo's Memorandum is fraught with mischaracterization of testimony, misquotations, distortion of case law and ad hominem attacks on the Trustee and his counsel.

(i) Does the Trustee have standing?

The Trustee has first asserted that his standing to bring this cause of action remains an issue. This issue was initially raised by Banner in its Motion to Dismiss the Trustee's Complaint in the Banner adversary. This Court held that the cause of action is an asset of the corporate debtor, and therefore the bankruptcy trustee may pursue it. *Luper v. Banner Industries, Inc. (In re Lee Way Holding Company)*, 105 B.R. 404, 410–11 (Bankr.S.D.Ohio 1989). However, this Court recognizes that there are no Ohio cases directly on point, a factor which the District Court also evidently noted on the appeal of this Court's Order; the District Court initially dismissed the appeal, but reconsidered and reopened the case to certify the issue to the Ohio Supreme Court.[15] The Second Circuit

---

**15.** PepsiCo has asserted that this Court cannot consider the certification of the issue to the Ohio Supreme Court, because it occurred after the Trustee filed his Motion for Settlement. In support thereof, PepsiCo cites *TCF Banking and Savings v. Leonard (In re Erickson)*, 82 B.R. 97 (D.Minn.1987) and *In re Greenacre*, 103 B.R. 1 (B.D.Maine 1989). This assertion is simply illogical. As the Second Circuit Court of Appeals has noted,

Court of Appeals followed this Court's opinion on Banner's Motion to Dismiss in the *St. Paul* litigation and further noted that nothing in modern Ohio law dictates to the contrary. Plaintiff's Exhibit 10 [*St. Paul Fire & Marine Insurance Company v. PepsiCo, Inc.*, 884 F.2d 688, 702 (2d Cir.1989)]. Magistrate Abel, to the extent his ruling in the RICO litigation is applicable, relied heavily on the Second Circuit's opinion in *St. Paul* to find that the Trustee has standing to assert a cause of action under RICO.[16] Plaintiff's Exhibit 14 p. 16 [*PepsiCo, Inc. v. Banner Industries, Inc.*, Civil Action C-2-86-1571, *slip op.* at 16 (S.D.Ohio January 8, 1990)]. The fact that each of these cases was decided based on the previous case, somewhat diminishes their persuasiveness. Furthermore, there is a conflict in the various circuit courts of appeal whether a corporation can pierce its own veil. *See St. Paul*, 884 F.2d at 696–99, and citations therein; *Mixon v. Anderson (In re Ozark Restaurant Equip. Co.)*, 816 F.2d 1222 (8th Cir.), *cert. denied sub nom.*, *Jacoway v. Anderson*, 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987). In any case, the Ohio Supreme Court is not bound by the federal court decisions in this area, since these are issues peculiar to state law.

PepsiCo has attempted to impeach Mr. Bradford's testimony with remarks he shared with opposing counsel to the effect that the Second Circuit's decision "puts to rest" and "resolved any lingering standing questions that may have existed with respect to the Trustee's claims". PepsiCo Memorandum p. 37, quoting Transcript pp.

1782–83. These observations, if accurate, are simply irrelevant in light of the certification of the issue to the Ohio Supreme Court and the conflict in the case law.

Thus, the Court is of the opinion that the Trustee has a very real danger presented by the issue of standing. In the event that the Ohio Supreme Court determines he has no standing, this annihilates those claims of the Complaint based on the alter-ego theory.

(ii) Can the Trustee prove liability?

Once the Trustee overcomes the question of standing, he must prove liability to the estate in order to obtain a judgment. The Trustee views this as the most substantial issue of the Banner adversary.

The Trustee's counsel argues that liability is uncertain in light of the ruling of the District Court in *St. Paul*. Plaintiff's Exhibit 9. Although admitting that, at first blush, the arbitrator's decision in *Central States* appears supportive, close analysis reveals that in reality it is not. This is largely because it has no *res judicata* or collateral estoppel effect since the issues are distinguishable. With these factors in mind, the Trustee points out that the case must be made largely from testimony of hostile witnesses and circumstantial evidence. PepsiCo counters these arguments by asserting that Bradford's analysis of the District Court's opinion conflicts with his previously articulated position, by insisting that the arbitrator's decision is supportive (since the arbitrator is the only factfinder which has assessed the credibili-

---

[E]valuation of the propriety of a settlement requires realistic consideration of the facts which affect the ultimate likelihood of success, and it would be inappropriate for a reviewing court to freeze matters as of the moment at which the parties entered into an agreement and ignore subsequent developments which either reinforce or undermine the original decision to settle.

*Newman v. Stein*, 464 F.2d 689, 696 (2d Cir.), *cert. denied sub nom. Benson v. Newman*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972). The court in *Erickson* attempts to distinguish *Newman* on the basis that the parties in *Erickson* were both aware of the possibility of legislative or judicial pronouncements but proceeded to reach settlement any way. This Court views this distinction as one without a difference.

**16.** The Court is not convinced that Magistrate Abel's findings regarding standing in the context of a RICO cause of action apply in the context of an alter-ego cause of action. In fact, PepsiCo in its Brief stated that "the Trustee's settlement motion, authored by Bradford concedes that four separate courts opinions, including one by this Court 'have concluded that this cause of action belongs to the Trustee' (Settlement Motion at 9–10)." Notwithstanding this statement, PepsiCo discusses only *St. Paul*, 884 F.2d 688. PepsiCo does not discuss what other two opinions aside from *St. Paul* and this Court's opinion are among those "four separate court opinions". PepsiCo Memorandum p. 37.

ty of witnesses), and by highlighting select excerpts of testimony in PepsiCo Exhibit 153 to show that there is supportive testimony available.[17] PepsiCo Memorandum pp. 41–42.

The Court is satisfied that the arbitrator's decision in *Central States* has little, if any, relevance to the Banner adversary. It was based solely on evidence which pertains to the motivations behind and circumstances surrounding creation of the ESOP by Banner. As such, the issues are distinguishable from the issues before this Court in the Banner adversary. The fact that the arbitrator is the only factfinder to have assessed the credibility of witnesses is irrelevant in light of the disparity of the issues. This also weighs against any *res judicata* or collateral estoppel effect, which require a mutuality of issues and parties. *See generally*, 18 Wright, Miller & Cooper, *Federal Practice and Procedure*, § 4402 (1981). *See also*, Banner Exhibit B–12 pp. 10–12 [*Banner Industries, Inc. v. PepsiCo, Inc.*, Case No. CIV 85–449–R (W.D.Okla. January 12, 1990)].

On the other hand, the holding of the District Court in *St. Paul* endangers the Trustee's position.[18] On the basis of judicial estoppel, PepsiCo urges the Court to disregard Bradford's testimony regarding the impact of the District Court's opinion. PepsiCo also points to previous statements made by Mr. Bradford in which he argued that the issues before the District Court were not analogous to the issues before this Court in the *Banner* adversary.[19] The Court need not reach the issue of judicial estoppel; the fact remains that the issues presented before the District Court in *St. Paul* and the issues presented before this Court in the Banner adversary are similar

and tangentially related. This Court has previously held that the parties in *St. Paul* and the parties in Banner adversary are not similarly situated, and that the ruling by the District Court in *St. Paul* is not binding on the parties here. *See* Document No. 1491 pp. 20–21 [Transcript of Wed., January 18, 1989 Status Hearing], incorporated by reference in Document No. 1488 [Memorandum Decision, January 23, 1989]. That ruling obviously does not require a different result here, nor is that ruling qualified by the Court's view on the issues before the Court now.

Finally, the excerpts of deposition testimony in PepsiCo Exhibit 153 highlighted by PepsiCo provide little support to PepsiCo's argument. The Court is not convinced that these excerpts are properly submitted for this purposes: the depositions are derived from litigation in various other forums involving numerous other issues, PepsiCo did not establish that the witnesses were unavailable, and there is no record regarding the opportunity or motivation for participation in these depositions by Banner or the Trustee. *See generally* Banner's Reply Brief pp. 39–40. In any case, the Court does not interpret these excerpts as supportive of the Trustee's claims as does PepsiCo; rather, the Court finds the excerpts to be of limited value to the alter-ego claim. Further, Banner refutes every factual assertion with evidence of its own. *See* Banner's Objections to PepsiCo's Proposed Findings of Fact; Banner's Reply Brief pp. 46–48.

(iii) What is the measure of damages?

Once the Trustee overcomes the hurdles presented by standing and liability, the question is posed of the extent of damages

---

**17.** PepsiCo follows these quotes with a quantum leap, stating "indeed, Banner's casting CL adrift in an undercapitalized state, *one* of Banner's acts, caused *all* of CL's debts." PepsiCo Memorandum p. 39. However, no such finding has been made by any court.

**18.** PepsiCo has made the suggestion that if the District Court had correctly rejected PepsiCo's alter-ego claim, "the Second Circuit would have affirmed [the District Court] *on the merits.*" PepsiCo Memorandum p. 45, citing *St. Paul*, 884 F.2d at 704. This statement is, of course, spe-

cious. The Second Circuit found that it must affirm the dismissal by the District Court on a jurisdictional basis, holding that PepsiCo lacked standing. Thus, it was inappropriate to reach the merits.

**19.** In support of its argument, PepsiCo has cited *TMT Trailer*, 390 U.S. at 431–34, 88 S.Ct. at 1166–68 and other cases. *TMT* is inapposite; the Supreme Court's holding in that case was premised upon the lack of a record established by the proponent of the settlement.

awardable to the estate. Banner has always asserted that it can only be held liable under the alter-ego theory for injuries specifically resulting from fraudulent or inequitable behavior. According to the Trustee, if this theory of damages prevails, the alter-ego claims would provide no benefit to the estate aside from those provided by the claims based on the tax-sharing funds, fraudulent conveyances and preferential transfers. Both Banner and the Trustee rely on *Bucyrus–Erie Company v. General Products Corporation*, 643 F.2d 413 (6th Cir.1981). PepsiCo responds that "every other bankruptcy case in the Sixth Circuit to construe *Bucyrus–Erie* has upheld alter-ego claims and pierced the corporate veil", citing *In re Baker and Getty Financial Services, Inc.*, 93 B.R. 559 (Bankr.N.D. Ohio 1988); *Matter of Lumara Foods of America, Inc.*, 74 B.R. 95 (Bankr.N.D.Ohio 1985) and *Matter of Long*, 35 B.R. 949 (Bankr.S.D.Ohio 1983). PepsiCo also points to this Court's opinion on Banner's Motion to Dismiss wherein the Court held that the Trustee's Complaint "has stated with sufficient particularity facts necessary to find control, injury, and causation, thereby providing the basis for an alter-ego claim under Ohio law." *Lee Way*, 105 B.R. at 411–12.

It is true that the courts in the cases cited by PepsiCo did indeed uphold alter-ego claims and pierced the corporate veil. However, that is not the question.[20] The issue is causation. Further, this Court's Order on Banner's Motion to Dismiss the adversary was simply a ruling on a motion to dismiss, taking all of the allegations of the Plaintiff's Complaint as true, as is required in the context of any motion to dismiss. Obviously, such a ruling is not equivalent to a judgment; this Court did not and cannot prognosticate the extent of Banner's potential liability. Although there have been cases where a parent corporation has been held liable for all of its subsidiaries' debts, *See Henderson v. Rounds & Porter Lumber Company*, 99 F.Supp. 376 (W.D.Ark.1951), the fact remains that, to prevail in the Banner adversary, the Trustee must show that Banner's "domination or control was used to commit fraud or wrong or other dishonest or unjust act, and [that] injury or unjust loss resulted ... from such control and wrong." *Bucyrus–Erie*, 643 F.2d at 418. *See generally* Annot., *Liability of Corporation for Contracts of Subsidiary*, 38 A.L.R.3d 1102 (1972). The burden of proof is, of course, on the Plaintiff/Trustee.

Thus, the Court is satisfied that the extent of damages presents a sizeable challenge to the Trustee in the Banner adversary.

(iv) What practical problems exist in connection with the alter-ego litigation?[21]

The Trustee's counsel also articulated certain practical problems which are presented by the Banner adversary. Among those problems are the appeal presently pending in connection with Banner's Motion to Dismiss in the Banner adversary, the certification of the standing issue to the Ohio Supreme Court, the possibility of multiple trials based upon the right to a jury trial which may attach to some of the Complaints of the Trustee's Complaint, and the question of whether the bankruptcy court can preside over such a jury trial. All of these factors necessarily impact the cost of this litigation, which must be funded from a finite source.

PepsiCo's response can be boiled down to the cliché, "That's Life!". PepsiCo points out that Mr. Bradford represents himself as an experienced litigator, and complex litigation is exactly what he and his firm were hired to handle. This does not obviate the fact that these practical problems remain, and that they will require great

---

**20.** In fact, in each of those instances, the court pierced the corporate veil with respect to the plaintiff's claim only. The court did not effect a turnover of all of the shareholders' assets, or render a judgment in the amount of all creditors' claims against the shareholder, which are two of the remedies sought by the Trustee here.

**21.** This obstacle suggested by the Trustee seems to relate to the category of complexity and expense of litigation more than the category of probability of success on the merits.

time and expense to accommodate or overcome. This is so especially in light of this Court's recent opinion on the Plaintiff's Motion to Strike the Jury Demand, which recognized the right of Banner to a jury trial on certain claims of the Plaintiff's Complaint. *See Luper v. Banner Industries, Inc.*, 118 B.R. 544 (Bankr.S.D.Ohio 1990) (Order on Motion to Strike Jury Demand). In that opinion, this Court further recognized that this Court is without jurisdiction to preside over such a jury trial, and suggested that the District Court consider withdrawal of the reference. However, inasmuch as the Plaintiff's Complaint presents both core and non-core matters, as well as issues which do not require a jury trial, the possibility of bifurcated trials is very real; the District Court may choose to withdraw reference on only certain aspects of the Banner adversary. In response to the Trustee's concerns regarding the expense of the litigation, PepsiCo has volunteered to prosecute the litigation at its own expense with its counsel, Schiff, Hardin & Waite. This proposal is discussed in more detail below; suffice it here to say that this proposal is impractical and untenable.

### b. *The Potential RICO Cause of Action*

In connection with the potential RICO claim allegedly owned by the estate, the Trustee's counsel suggested that the RICO's claims are merely an expanded version of the alter-ego claims. Thus, the alter-ego issues presents threshold issues which must be overcome before the estate can proceed with a judgment under the RICO Act. If the Trustee cannot prove the alter-ego claim, then it is highly unlikely he could prevail on a RICO claim, which presents much more complex and difficult issues. The Trustee's counsel added that a RICO claim could not expand Banner's exposure inasmuch as the First and Second Claims for Relief of the Complaint seek to hold Banner liable for all claims against the Debtor or, in the alternative, seek turnover of all of Banner's assets. In response to the Trustee's remarks, PepsiCo points out

that the RICO cause of action articulated in PepsiCo's Third Amended Complaint, *see* PepsiCo Exhibit 150, asserts different causes of action based on different facts against defendants other than Banner. PepsiCo also points out that the Second Amended Complaint survived a Motion to Dismiss in the District Court and that Magistrate Abel has already determined that the Trustee has standing. *See* Plaintiff's Exhibits 13 and 14.

PepsiCo is correct that the RICO cause of action articulated in PepsiCo's Third Amended Complaint asserts a cause of action based on different facts and against defendants other than Banner. Nonetheless, it is equally true that the RICO cause of action cannot significantly increase Banner's exposure to the bankruptcy estate. Furthermore, while PepsiCo's Complaint survived a Motion to Dismiss in District Court, that is hardly equivalent to a judgment on the merits. Inasmuch as PepsiCo has just recently filed a Third Amended Complaint, the Court can surmise that the case is not yet and never has been at issue, but rather is in the embryonic stages. Thus, extensive discovery and preparation time is needed. Transcript pp. 174–75, 941.

Just as one cannot force abandonment of a substantial claim merely by filing a substantial counterclaim with large numbers attached, *In re Hydronic Enterprise, Inc.*, 58 B.R. 363 (Bankr.D.R.I.1986), one cannot create an asset merely by filing a complaint with a big number attached. Civil RICO claims are by their very nature complex and difficult. *Mashburn v. National Healthcare, Inc.*, 684 F.Supp. 660, 668 (M.D.Ala.1988). An especially difficult issue is posed by the question of the level of "participation" required to fall within the strictures of RICO. *Mashburn*, 684 F.Supp. at 668–69. To the extent that PepsiCo's Third Amended Complaint asserts causes of action against other defendants than Banner and its officers, directors, and employees, the Trustee's Settlement Agreement does not inure to their benefit.[22]

---

**22.** Although the parties have not raised or dis- cussed the issue, the Court has some reserva-

### c. *PepsiCo's General Objections*

PepsiCo has asserted several general objections which the Court has generally categorized as (i) sufficiency of the Trustee's knowledge and investigation, and (ii) sufficiency of the value given by Banner in the settlement. To the extent relevant, the Court has attempted to discuss these general objections below.

**(i) Was the Trustee Sufficiently Informed To Make An Intelligent Decision?**

■ PepsiCo argues that the Trustee has not fully apprised himself of the law and facts necessary to formulate an intelligent and informed opinion of the Banner adversary in the potential RICO claim. PepsiCo is especially peeved that the Trustee never received a detailed written legal memorandum from Jenner & Block. In connection with this point, PepsiCo insists that the Trustee and his counsel have conducted insufficient investigation of the factual and legal merits of the case. Thus, the Trustee and his counsel's testimony lacked foundation. As evidence of this, PepsiCo suggests that the Court compare the fee applications of Trustee's counsel and of Vorys, Sater, Seymour & Pease ("VSSP"), which is responsible for prosecution of the adversary proceeding against PepsiCo. The fee applications reflect that VSSP has expended substantially more time to the PepsiCo adversary than Jenner & Block has to the Banner adversary. Further, PepsiCo argues that there is no evidence that the Trustee's counsel rendered legal advice to the Trustee; thus, the Court can and should infer that the testimony would not have been favorable to the Trustee's position, citing *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 225–26, 59 S.Ct. 467, 473–74, 83 L.Ed. 610 (1939) and *Coal Processing Equipment, Inc. v. Campbell,* 578 F.Supp. 445, 465 (S.D.Ohio 1981).[23]

■ The Court is satisfied that the Trustee is sufficiently informed to make an objective and intelligent decision on this matter. His counsel reviewed approximately 35,000 pages of documents, including the *St. Paul* Motion for Summary Judgment record and other documents which Banner has successfully withheld from PepsiCo under assertions of privilege.[24] Transcript pp. 66–80. PepsiCo is concerned that the Trustee or his counsel did not review the *Central States'* record; the Court deems this insignificant inasmuch as the issues are so disparate. See discussion § VI.A.2.a.(ii), pp. 893–894, *supra.* Not only did they review documents produced by Banner, but the Trustee's counsel also reviewed various court decisions in the litigation pending around the country ancillary to the Banner adversary. Despite PepsiCo's remarks, the Court is of the opinion that the Trustee and his counsel need not be so familiar with the case as to be prepared for trial. Familiarity with a case, its factual patterns, legal theories, and evidence does not necessarily require, as PepsiCo would suggest, the devotion to the case illustrated by VSSP. If this were the case, there would be little reason to explore settlement. Furthermore, the Trustee has a duty to conserve the assets of the estate to the extent possible and especially where, as here, there are finite assets available to fund the costs and fees of litigation.[25] Despite the volume of doc-

---

tions surrounding whether the statute of limitations as to the RICO claim may have expired. *See, Agency Holding Corp. v. Malley–Duff and Associates, Inc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) (holding that the four-year statute of limitations under the Clayton Act applies to civil RICO actions).

**23.** PepsiCo also cited *NLRB v. Evans Packing Company,* 459 F.2d 193, 197 (6th Cir.1972); however, there is no such case published in Volume 459 of the Federal Reporter, 2d series.

**24.** Banner also asserted privileges with respect to these documents as to the Trustee, but al-

lowed the Trustee's counsel to review them pursuant to a confidentiality agreement. The Court has not yet ruled on the Trustee's Motion to Compel Discovery with respect to some of these documents.

**25.** Testimony revealed that PepsiCo has expended approximately $13 million dollars in fees and costs in connection with its litigation pending against Banner or related to Lee Way in various forums. Despite this great expenditure, PepsiCo has yet to obtain a judgment or recover any sum from Banner. Transcript pp. 1896–1897; Brody Deposition pp. 182–183.

uments and depositions to which PepsiCo points,[26] PepsiCo has not made any showing that these documents add to those which the Trustee and his counsel have reviewed, or that the additional materials are otherwise non-accumulative or relevant.

The Court also views the "omission" of detailed legal memoranda regarding the issues as unimportant. The evidence submitted by PepsiCo, consisting of Mr. Raleigh's testimony, is of little weight; as mentioned above, he can testify only as to the practices in the Northern District of Illinois, which hardly have a pervasive quality. He admitted, as he must, that legal memoranda are not required under the Bankruptcy Code, and PepsiCo has cited no case law in support of this point.

■ PepsiCo utilized the issue of the written memoranda to bolster its theory that the Trustee's counsel failed to render sufficient legal advice to the Trustee. At the very least, PepsiCo argues, that there is insufficient evidence to support such a finding.[27] On the basis of the cases cited, PepsiCo would have this Court infer that the Trustee's decision to assert attorney-client privileges is indicative of unfavorable testimony. This the Court is not able to do. The *Interstate Circuit* case is distinguishable. In that case, the Court was not faced with a privilege assertion. Furthermore, the Supreme Court noted in that case, that only when proof has been submitted which supports an adverse inference does the burden rest on the adversely impacted party to come forth with evidence to explain away or contradict the proof. *Interstate Circuit*, 306 U.S. at 225–26, 59 S.Ct. at 473–74. Here, the record reveals no proof to support a negative inference against the Trustee.

The case of *Coal Processing* cited by PepsiCo is at first blush persuasive. In that case, the Court stated that testimony by the Defendant,

> which could support an inference of good faith, was substantially undercut by the fact that neither [of his attorneys] testified. It is a well settled rule that if a party knows of the existence of an available witness on a material issue and such witness is within his control, and if, without satisfactory explanation, he fails to call the witness, the trier of fact *may* draw the inference that the testimony of the witness would not have been favorable to that party. (Emphasis added.)

Under this language, this Court *may* make an inference, but it is not required to do so. Rather, in this instance, the Court must make inferences in favor of the Trustee. Mr. Luper has vast experience as a Trustee in this District. Transcript pp. 850–854. The Court is of the opinion that if Mr. Luper were not getting sufficient advice from his counsel, he is certainly well-versed in the remedies available and would undoubtedly seek other counsel. Furthermore, assertion of the attorney-client privilege is a valid consideration when faced with the suggestion by PepsiCo and in light of the concerns discussed by the Court below. See discussion § VII.B., pp. 907–908, *infra.*[28]

#### (ii) Is Banner Giving Sufficient Value To Justify The Settlement?

PepsiCo maintains that insufficient value is being collected by the estate in exchange for the settlement. PepsiCo's opening salvo accuses the Trustee of granting a 99% "discount" which cannot be justified. PepsiCo follows with an assertion that no dividend will flow to the unsecured creditors as a result of the settlement, that there is no

---

26. As mentioned above, PepsiCo asserts that there are 400,000 pages of documents and 340 days of depositions. Transcript pp. 1684–88.

27. PepsiCo asserts alternatively that there exists sufficient evidence that Jenner & Block's advice to the Trustee was inconsistent with the position that Jenner & Block is now taking. PepsiCo Memorandum p. 34. In its Memorandum, PepsiCo relies on allegedly inconsistent statements made orally and in writing to the Court. How-

ever, no such inference can be made based upon these references.

28. This is particularly so in light of the fact that one cannot selectively waive the privilege; once waived, it is waived for all purposes. This could result in disclosure of non-favorable information received by the Trustee which is unrelated to this point, but which could be damaging to his position.

value in Banner's waiver of claims or indemnification of the estate, and that the Trustee has demanded no compensation for the settlement of the alter-ego and RICO claims. The Trustee refutes each of these points.

PepsiCo is aggrieved that the Trustee has settled for only $6,000,000 plus other considerations, when, in PepsiCo's estimation, the alter-ego claims is worth over $500,000,000 and the potential RICO claim is worth $120,000,000 plus costs and fees. The settlement amount, PepsiCo asserts, cannot be justified in light of the case law and previous admissions by the Trustee and his counsel. As if to lend credence to its argument, PepsiCo has reiterated at every available opportunity that the settlement represents a 99% "discount".

These arguments ring hollow. Notwithstanding any remarks made to the Court by the Trustee or his attorneys, the fact remains that the claims are only worth what can be proven as damages. This issue presents no mean task as is illustrated by the discussion above. See discussion § VI.A.2.a.(iii), pp. 894–895, *supra.* Simply stating that a claim may have a specific value does not make it so. Thus, the doctrine of judicial estoppel only applies where a party has *successfully* asserted an inconsistent position in a prior proceeding. *Edwards v. Aetna Life Insurance Company,* 690 F.2d 595, 599 (6th Cir.1982). It is true that the Trustee's counsel in prior hearings has stated that the Trustee is pursuing Banner in an amount sufficient to pay all claims of the estate under the alter-ego theory. However, judgment has not been entered in favor of the Trustee and against Banner in the Banner adversary, and PepsiCo has failed to show that the Trustee has successfully relied on these representations to obtain a favorable ruling, or that this Court has relied on any such assertions to

render any rulings favorable to the Trustee.[29]

As the court noted in *Energy Cooperative,* 886 F.2d at 927, settlement cannot be assessed in a balance sheet or discount fashion. *Energy Cooperative* is closely analogous to the instant case: In that case, the Trustee was pursuing an alter-ego claim which sought damages of approximately $300,000,000. The appellant/creditors insisted that the bankruptcy court should have required that a value be assigned to each claim. The appellate court recognized that under this methodology, a 10% chance of success would render a settlement value of $30,000,000 to the estate, but inducing the adverse party to pay such a sum was unlikely in practice. The cases cited by PepsiCo in which large "discounts" were disapproved are not helpful to PepsiCo: In three of the cases, the court found there to be a strong likelihood of success.[30] In another case, the court found that prosecution of the Trustee's claim would require little delay and minimal cost to the estate,[31] and in the last, the court found there to be insufficient evidence to justify the compromise which would release insiders.[32] The instant case differs from each of these.

PepsiCo also urges that the Court find no value in the provisions for Banner's forgiveness of debt and indemnification of the estate as to certain claims, since Banner already is liable for the indemnified claims, and because Banner admitted its claims are "worthless" in the *Courtney* litigation. These arguments fail to recognize that Banner may have a right of subrogation or a right to assert a claim against the Debtor for amounts Banner had paid pursuant to personal guaranties or other theories of liability. The indemnification and the waiver of claims against the estate certainly have value in the event that a dividend is ultimately payable by the estate to unsecured creditors. Such indemnifications and

---

**29.** PepsiCo also states that the Trustee admitted that the settlement amount represents a 90% discount, and PepsiCo cites to the transcript of the hearing. This quote distorts and mischaracterizes the Trustee's testimony.

**30.** *In re Emerald Oil Company,* 807 F.2d 1234 (5th Cir.1987); *In re Meyer,* 105 B.R. 920

(Bankr.D.Minn.1989); *In re Hydronic Enterprise, Inc.,* 58 B.R. 363 (Bankr.D.R.I.1986).

**31.** *In re Hallet,* 33 B.R. 564 (Bankr.D.Me.1983).

**32.** *In re Old Town Historic Building Ltd.,* 79 B.R. 8 (Bankr.C.D.Cal.1987).

waivers of claims decrease the total potential claims against the dividend pool, thereby increasing the dividends to other creditors. In light of the millions of dollars claimed by Banner, it is highly unlikely that other creditors view this offer as insignificant; the Court certainly does not. The fact that the Trustee rejected this provision in earlier settlement negotiations is irrelevant to the settlement agreement before the Court; that previous offer included no cash to the estate, and there is no evidence that it contained any consideration to the estate other than a forgiveness of debt.[33]

PepsiCo also urges the Court to find that no value has been given for the alter-ego claim or potential RICO claim. Like the objecting parties in *Energy Cooperative*, PepsiCo implies that the Trustee must receive some consideration from settlement of these claims. However, the court in *Energy Cooperative* found this approach "myopic" and noted, "the world of settlements does not read like a balance sheet— nor should it. Assigning value to contested claims cannot be done with ... precision...." *Energy Cooperative*, 886 F.2d at 928. In any case, the Court finds that PepsiCo's suggestion is without merit. The Trustee's testimony, which is unrefuted, reflects that he estimates the range of potential recovery for the causes of action other than the alter-ego and RICO claims, to range from $4,050,000. to $5,250,000. Thus, the existence of these claims increased the settlement amount at least $750,000.00, and possibly as much as $1,950,000. This is not including the other concessions by Banner to which the Court ascribes meaningful value.

▉ Finally, PepsiCo argues that no dividend to unsecured creditors will result by virtue of this settlement. However, the Court must take into consideration the existing administrative claims as well as prepetition claims, since these must be paid from the assets available. The key is the best interest of the estate. The reasonableness of the settlement does not and cannot depend on whether or how much dividend would be paid to the unsecured creditors. *See Magill v. Springfield Marine Bank (In re Heissinger Resources Ltd.)*, 67 B.R. 378 (C.D.Ill.1986); *In re Hanson Industries, Inc.*, 88 B.R. 942 (Bankr.D.Minn.1988).

### B. *Difficulty of Collection*

The Trustee testified that collectibility, or lack thereof, was not a substantial consideration in settlement of the disputes with Banner. Transcript pp. 918, 176; Luper Deposition p. 171. PepsiCo offered that "This should be the *only* one of the *Drexel* factors that matter." PepsiCo Memorandum p. 49. It is unclear what point PepsiCo is attempting to make with this statement; suffice it to say, however, that if PepsiCo is attempting to assert that Banner can pay any judgment amount regardless of its size, there is no evidence in the record to substantiate this. Rather, the Court notes that the only statement in the record regarding Banner's solvency is the testimony of the Trustee that he understands Banner's net worth to be $100,000,-000. Transcript p. 918. The Trustee further testified that Banner is in jeopardy of suffering a substantial claim by the Internal Revenue Service, as reflected by Banner's S–1 filing with the Securities and Exchange Commission, which would "denude Banner of its entire net worth." Transcript p. 918. This testimony by the Trustee was not challenged on cross-examination or refuted by PepsiCo in any fashion. PepsiCo has repeatedly argued that the value of the alter-ego claims against Banner exceed $500,000,000 based upon the claims against the Debtor's estate. If this is the case, a fact of which the Court is not convinced, clearly collectibility would be a substantial problem. This is further underscored when PepsiCo asserts that the RICO claim has a value of over $120,000,000. PepsiCo Memorandum pp. 24–25, citing PepsiCo Exhibit 150. The *Texaco* bank-

---

**33.** PepsiCo also asserts that Banner admitted its claims "worthless" in the *Courtney* litigation. This is yet another example of mischaracterization and distortion. A review of the full text of Banner's statements reveal that Banner felt the claims have no value as an asset to Banner in light of the likelihood that there would be no dividend from the Lee Way estate.

ruptcy case is a prime example of what can follow rapidly on the heels of an adverse judgment of such a staggering amount. *In re Texaco, Inc.*, 81 B.R. 806 (Bankr.S.D.N.Y.1988).

## C. *Complexity, Expense and Delay in Litigation*

The complexity of the factual and legal issues, expense which can be incurred, and delay occasioned by pursuit of litigation may be reasons in support of approval of a settlement. No one has or seriously can dispute the factual and legal complexities presented by the Banner adversary. The Complaint asserts 13 claims, to which Banner responded with seven counterclaims and numerous affirmative defenses. Claims brought under the alter-ego theory and the RICO statute are by their very nature more complicated and difficult than the average cause of action. These complexities are amply illustrated by the discovery record relative to the issues, consisting of 400,000 pages of documents and 340 days of deposition testimony. Transcript pp. 1686, 1687–88. The complexity is compounded by the novelty of certain legal issues which have arisen in the context of the adversary proceeding. Banner initially moved to dismiss the alter-ego counts of the Complaint based on the standing issue. When this Court denied the Motion to Dismiss, Banner appealed the decision. The District Court initially dismissed the appeal, but reconsidered and reopened the appeal in order to certify the matter to the Ohio Supreme Court for determination.[34]

The Trustee's counsel adeptly discussed the procedural problems which address him in the Banner adversary which elucidate the complexity as well as potential delay inherent in the Banner adversary. Those problems include a potential motion for summary judgment threatened by Banner, Transcript p. 150, which undoubtedly would be a major project for the parties and the Court.[35] The parties are faced with a jury trial, to which this Court has determined that Banner is entitled in connection with some of the counts of the Complaint. In that Order, the Court indicated an intent to transmit the adversary proceeding *in toto* to the District Court pending determination of the District Court of the propriety of withdrawal of reference. This right to jury trial held by Banner, could very well give rise to multiple trials in the adversary proceeding; in light of the core nature of some of the claims, e.g. preferences and fraudulent conveyances, the District Court may choose the option of withdrawing reference on only certain aspects of the adversary proceeding. Those portions which the District Court may take for trial may be substantially delayed due to the priority with which the District Court must address pending cases.

The potential RICO cause of action severely increases the possibility for delay. Inasmuch as PepsiCo has just recently filed a Third Amended Complaint, the Court can surmise that the case has never become at issue, but rather is in the embryonic stages. Thus, extensive discovery and preparation time is needed. Transcript pp. 174–75, 941.

A trial in this Court undoubtedly presents significant problems. The Trustee's counsel has indicated that a trial will require at least three to four weeks in time. Transcript p. 173. This Court is unable to accommodate an uninterrupted trial of that length. Therefore, such a trial would be scheduled in two to three day increments over several months. This in and of itself is inefficient and expensive, especially for

---

**34.** PepsiCo has suggested that events subsequent to the filing of the Trustee's Motion for Settlement are not to be considered by the Court. This proposition is without logic if the Court is to seriously address the complexity, expense and delay component of the *Drexel* test. *See* footnote 15, *supra*.

**35.** The Court will note here that a Motion for Summary Judgment filed by PepsiCo in the PepsiCo adversary and the attendant briefing resulted in 383 pages of argument and 243 labelled exhibits (some of the exhibits are composites): approximately 23 inches of paper and 17 months of time and work. The summary judgment record in *St. Paul*, Plaintiff's Exhibit 8, is comprised of four storage boxes!

out-of-town counsel.[36] Finally, an adverse result will undoubtedly give rise to appeals by Banner; this can be presumed by the Court in light of the numerous appeals which have been filed thus far in this bankruptcy case, and the contentiousness with which this adversary proceeding has been litigated.

The Trustee guessed that attorney fees to prosecute the Banner adversary to conclusion would exceed $300,000. His counsel estimated the cost would approach $1,000,000. Transcript pp. 277–84. PepsiCo has asserted that these estimates are mere speculation, but cannot seriously suggest that this litigation would not be expensive. The cost factor has taken on extreme importance in this case. The fee applications of the Trustee and his counsel (Luper, Wolinetz, Sheriff & Neidenthal) for the four-month period ending March 31, 1990, plus the applications of the Trustee's co-counsel (Jenner & Block) and Creditors' Committee counsel (Vorys, Sater, Seymour & Pease), for the four-month period ending April 30, 1990, exceeded $500,000. See Documents No. 1996, 1997, 2108 and 2114, respectively. The Trustee has approximately $3,000,000 in unencumbered funds, and as of October 1, 1990, there were pending before the Court requests for fees and expenses of $735,066. For the period ending August 31, 1990, Jenner & Block has requested fees and expenses of $179,144, and Vorys, Sater, Seymour & Pease has requested $158,195, for a total of $337,-339.[37] See discussion § II, p. 887, *supra*. If the attorneys continue to render services and incur fees at the existing rate, the funds will be exhausted within 16 months. The rate of activity shows no signs of slowing: PepsiCo recently requested that the Court lift the stay on discovery and prosecution of its counterclaim in the Pep-

siCo adversary. Furthermore, PepsiCo has complained that Jenner & Block has not expended as much time in pursuit of the Banner adversary as Vorys, Sater has expended in pursuit of the PepsiCo adversary. Thus, it would be reasonable to assume that if the Trustee's Motion for Settlement is denied, Jenner & Block will have to substantially increase its activity, beginning with the briefing of the standing issue certified to the Ohio Supreme Court, completion of discovery, and prosecution of the recently filed appeals of the Court's Order on the jury trial issues.

PepsiCo has suggested that the Trustee has not conducted a meaningful analysis of the factors discussed above, since he has not obtained a litigation budget or calculation of the potential costs, or a litigation plan. PepsiCo asserts, in short, that the Trustee simply wants out of the litigation for his own convenience, pointing to select excerpts of the Trustee's testimony at the settlement hearing. Banner has countered that litigation budgets are notoriously inaccurate and that nothing in the Bankruptcy Code or Rules require that the Trustee obtain such a budget or plan from his counsel. The Code and Rules do not mandate preparation of litigation budgets or litigation plans. There is no evidence in the record regarding their accuracy either way. In any case, these are not really necessary for the Court to evaluate the complexity or potential delay presented by the Banner adversary.

As to the Trustee's motivation, the Court is satisfied that the Trustee's concern is to further efficient administration of the estate, and ultimate resolution of the bankruptcy case. Transcript p. 970. The language used by the Trustee in response to PepsiCo's questions which was quoted by

---

**36.** PepsiCo cannot pretend that the role of out-of-town counsel is irrelevant. Due to the magnitude and number of parties-in-interest in this case, the Trustee was forced to seek counsel outside of the Columbus area. Transcript p. 861. Furthermore, the aggressiveness with which PepsiCo has pursued its interests necessitated retainer of a large firm with substantial resources.

**37.** As of October 1, 1990, total fees awarded and expenses reimbursed in this case to Trustee's and Creditors Committee's counsel are as follows—

Luper, Wolinetz (since Jan., 1987) $388,614, see Document No. 2265; Jenner & Block (since June, 1987) $669,547, see Documents No. 1340, 1342, 1508, 1522, 1840, 1953, 2161; VSSP (since March, 1985) $1,345,570, see Document No. 2339; for a total of $2,403,721.00.

PepsiCo in its Memorandum, is technically accurate, but mischaracterized.[38]

As to expense, PepsiCo argues that this factor is of no relevance and offers to prosecute the Banner adversary with its counsel, Schiff, Hardin & Waite. The Trustee has rejected this offer, inappropriately according to PepsiCo. In any case, PepsiCo urges that the financial ability of the estate is not a basis for approving the settlement, citing *Lion Capital Group*, 49 B.R. 163 (Bankr.S.D.N.Y.1985).

The Court has not been presented with a motion seeking authority to retain or employ Schiff, Hardin & Waite. However, the Court can say with substantial certainty that such a motion would not be granted. First, the Court is of the opinion that a substantial conflict of interest would exist in light of the fact that the Trustee is presently in litigation with PepsiCo, in which PepsiCo is represented by Schiff, Hardin & Waite. The facts underlying that cause of action are closely intertwined with the facts underlying the Banner adversary. Thus, the Trustee would be placed in the awkward position of having to share information, communications and confidences with an attorney who represents PepsiCo. Second, given the aggressive stance that PepsiCo has taken in this case, it is highly questionable whether the Trustee or PepsiCo would control the litigation and from whom Schiff, Hardin would take its instructions. Additionally, the proposition presents a scenario greatly prejudicial to Banner, who is entitled to shield certain communications from PepsiCo, but not from the Trustee. Those communications would be shared with counsel

for the Trustee; if that counsel is Schiff, Hardin, they might feel compelled to convey those communications to PepsiCo at the expense of Banner. PepsiCo has cited the case of *Reiss v. Hagmann*, 881 F.2d 890 (10th Cir.1989) in support of its offer to represent the Trustee. *Reiss* is closely analogous, but distinguishable. In that case, the Chapter 7 trustee sought court approval of a compromise; the sole creditor in the case objected, and offered its counsel to represent the trustee at no cost to the estate. The *Reiss* court found the probability of success of the subject litigation to be nearly 100% and that the proposed counsel did not have an impermissible conflict.[39]

■■■ The *Lion Capital Group* case is similarly distinguishable from the instant case. In *Lion Capital*, there existed a strong likelihood of success on the merits and sufficient funds were available to prosecute the controversy to completion. Further, the *Lion* court noted that the only expense remaining in the case consisted of resolution of claims and prosecution of the controversy through trial. Notwithstanding PepsiCo's theory, ability to bear the costs of litigation is a legitimate concern. *Energy Cooperative*, 886 F.2d at 928. In the realities of the business world, no attorney or law firm can long afford to bear the costs of protracted litigation. As discussed above, it is clear in this case that there are not sufficient funds available with which to fund litigation and the likelihood of success on the merits is not sufficiently strong to justify the risk.[40]

### D. *Interests and Views of Creditors*

As the *Drexel* court noted, the creditors are entitled to voice their views on the

---

**38.** PepsiCo expounded at great length on the Trustee's motivations at the beginning of its Post–Hearing Memorandum, denigrating the Trustee's integrity and motivations. The Court will not expend its time and resources in responding to these allegations. Suffice it to say that the Court having observed the demeanor of the witnesses, considered their remarks in the context within which they were given, and knowing the integrity and professionalism of the Trustee, is satisfied that the Trustee's motivations are not as suggested by PepsiCo.

**39.** The *Reiss* court went on to state that if the bankruptcy court found the proposed attorney's

representation improper, it could require that the expenses of a different attorney be paid by the creditor as a condition to disapproving the proposed settlement.

**40.** PepsiCo has also suggested that the Supreme Court requires rejection of inadequate settlements regardless of the circumstances, citing *TMT Trailer*, 390 U.S. at 435, 88 S.Ct. at 1168. PepsiCo fails to recognize, however, that the adequacy of the settlement depends upon the total of *all* of the circumstances, including the potential cost of the litigation.

proposed settlement, and their reasonable views are entitled to deference. However, an objection by the largest creditor does not necessarily control the decision of the Court. *American Reserve Corp.*, 841 F.2d 159 (7th Cir.1987); *A & C Properties*, 784 F.2d at 1382; *In re Bell & Beckwith*, 93 B.R. 569, 579 (Bankr.N.D.Ohio 1988). PepsiCo is the only creditor, aside from Mr. Crowe, to object to this settlement.[41]

PepsiCo cites several cases for the proposition that courts routinely defer to major creditors who object to a compromise, especially when they offer to finance litigation. PepsiCo further argues that the Creditors' Committee's sanction of the settlement is not entitled to any weight because their opinion was formulated without adequate information and because counsel for the Creditors' Committee has a conflict of interest.

As discussed above, the Court is not persuaded by PepsiCo's offer to prosecute the litigation via Schiff, Hardin & Waite. Nor is PepsiCo's citation of *Reiss v. Hagmann* persuasive in light of the distinctions between that and the instant cases. On the other hand, the Court is persuaded by the Creditors' Committee's support of the Motion. While the Creditors Committee may not be as familiar with the facts and background of the case as is PepsiCo or even the Trustee, the Committee is vested with the responsibility of representing the interests of all creditors and the Court is not willing to assume that they have not adequately done so.[42] Additionally, the creditors holding the Uselton claim, the holders of the largest unsecured claim filed in the case, received the entire Motion (as well as

Notice of the Motion) through their attorney, and did not choose to file an objection.[43] Transcript pp. 1436–42.

As to the alleged conflict on the part of the counsel for the Creditors Committee, PepsiCo has been raising this spectre throughout this case whenever it was convenient and advantageous for PepsiCo to do so. PepsiCo is of the opinion that LWMF and CLMF creditors have distinct interests, and that, at a minimum, the LWMF creditors are not adequately represented by the Creditor's Committee. However, PepsiCo has never filed a motion for an additional creditors' committee under § 1102 of the Bankruptcy Code or to deconsolidate or bifurcate this Chapter 11 case. Having raised this issue for five years without taking any action in furtherance of its interests, the Court can only surmise that the complaint has no validity. Certainly, no proof of divergent interests has been submitted to the Court.

Finally, the United States Trustee, vested with the responsibility to oversee administration of all bankruptcy cases has not seen reason to object or demand further explanation of the settlement from the Trustee.[44] It is clear that PepsiCo's views are unrealistic and motivated by considerations not common to all creditors. This is amply illustrated by the quantity and contentiousness of the litigation that has been spawned by the merger of CLMF and LWMF, and the subsequent bankruptcy case. Under these circumstances, the Court is satisfied that the reasonable views and the interests of creditors do not militate disapproval of the settlement.

**41.** Central States objected to the settlement, but withdrew its Objection after the hearing was concluded. PepsiCo argues that this was based on an agreement between Central States and Banner, rather than an assessment of the merits. As the Court was in its final preparation of this Order, PepsiCo filed a Second Motion for Leave to Supplement the Record on October 12, 1990. The Motion set forth fully the matters desired to be brought to the Court's attention. The Court considered the submission and concluded that it related to one of the aspects of this case that was not a significant factor in the conclusion reached by the Court. Therefore, it

was not deemed necessary to withhold the entry of this Order for responsive briefs or hearing.

**42.** The fact that the Committee may have been presented with the agreement as a "done deal" is irrelevant. Faced with the option to "take it or leave it", the Committee could have chosen to leave it.

**43.** The Motion even proposed disallowance of the *Uselton* claim.

**44.** Interestingly, Roy Crowe, the only other creditor to object to the settlement, asserts that PepsiCo is responsible for payment of his claim.

## VII. OTHER OBJECTIONS RAISED BY PEPSICO

PepsiCo has raised numerous other objections, many of which the Court views as *de minimus* and will not address.[45] Unfortunately, PepsiCo in its Brief engaged in character assassination of the Trustee and his attorneys, which did more to cloud the issues than illuminate legitimate points of concern.[46] Nonetheless, the Court will address the most salient points raised by PepsiCo.

### A. *Trustee's Prosecution of the Banner Adversary*

PepsiCo pointed to several facts which PepsiCo claims illustrates the Trustee's mishandling of the Banner adversary. Among them are: (1) The Trustee has never vigorously prosecuted the adversary in that his counsel at various stages of the adversary proceeding has failed to vigorously prosecute the adversary proceeding, agreed to a year to complete discovery, and implemented a self-imposed stay during the settlement negotiations. PepsiCo asserts that the Trustee has spent significantly less time on the case compared to the time expended by Vorys, Sater, Seymour & Pease in connection with the PepsiCo adversary, and his counsel has failed to take depositions, or view documents and depositions generated by collateral litigation, including the *Central States'* decision or the record. (2) Jenner & Block has put in a "third-string lawyer" who fashioned his testimony for the settlement hearing. PepsiCo Memorandum pp. 13, 33, 38. (3) The Trustee has devoted his resources to settlement rather than prosecution of the adversary.

The Court is not convinced that these accusations made by PepsiCo are accurate or relevant to the issue of whether the Trustee has properly prosecuted the Banner adversary. Even if they are, however, they have no bearing or relevance to the ultimate question before the Court: Whether the settlement is in the best interests of the estate. PepsiCo has cited no case which would support the proposition and the Court is of the opinion that there is none. Most telling is that PepsiCo has never before raised these issues. Never before has PepsiCo impugned the ability or the integrity of the Trustee or Jenner & Block. As a party-in-interest, PepsiCo certainly could have moved for the Trustee's or his counsel's removal, or objected to fee applications.[47] In any case, the Court makes the following comments with regard to the issues raised by PepsiCo.

The Court is satisfied that the Trustee has adequately prosecuted the Banner adversary. PepsiCo's irritation with the actions of Booth, Marcus & Pierce, former counsel for the Debtor, are largely irrelevant, inasmuch as the Trustee (who was appointed in January, 1987) sought the appointment of Jenner & Block to represent him shortly after his appointment. Document No. 985 [Application for Appointment of Co-counsel ..., filed June 11, 1987]. The Trustee's Application to retain Jenner & Block was granted on June 18, 1987. *See* Document No. 995. PepsiCo is further irritated that Jenner & Block did not prosecute the adversary further *after the Court granted a stay of discovery pending a ruling on Banner's Motion to Dismiss*. The Court finds this statement disingenuous. The fact that Jenner & Block projected a year for discovery indicates to the Court only an interest in diligent preparation for trial. As PepsiCo itself has pointed out, there have been 340 days of depositions taken, and 400,000 pages of documents generated by the liti-

---

**45.** This tactic is evidently employed by PepsiCo in other forums as well. *See* Opinion and Order by the Honorable George C. Smith, District Judge in *Lee Way Holding Company v. Liberty Mutual Insurance Company (In re Lee Way Holding Company)*, Appeal Case No. C2–86–0632, *slip op.* at 10 (S.D.Ohio July 11, 1990).

**46.** Footnote deleted for publication.

**47.** Interestingly, PepsiCo objected to each and every fee application by Vorys, Sater, Seymour & Pease, who represents the Trustee and Creditors' Committee in the adversary proceeding pending against PepsiCo. However, as noted above, PepsiCo has never objected to the fee applications of Jenner & Block, which is responsible for prosecution of the various other adversary proceedings in this case.

gation between Banner and PepsiCo in various forums, and the Court does not believe the Trustee has implemented a self-imposed stay during the settlement negotiations in light of the record of the Banner adversary: The parties have exchanged discovery, briefed and argued a (i) Motion to Compel Discovery by the Trustee, (ii) a Motion to Strike Banner's Demand for a Jury Trial by the Trustee, (iii) a Motion to Consolidate adversaries, and prosecuted an Appeal by Banner of this Court's Order on Banner's Motion to Dismiss. In any case, conservation of resources is certainly legitimate, in the best interests of the estate and in compliance with Mr. Luper's duties as Trustee.

## B. *The Settlement Process*

PepsiCo insists that the settlement process is flawed in that it was controlled by Banner and in that the Trustee failed to disclose information to the Creditors. Again, the Court is disappointed by PepsiCo's emphasis on immaterial facts and inaccurate statements. To the extent it may have bearing on the approval of the compromise, the Court will address those elements of the settlement process which PepsiCo views as flawed and which the Court views as having some relevance.

■■■ PepsiCo insists that Banner controlled the settlement process to the detriment of the estate. However, PepsiCo makes this assertion without specifying how the estate was damaged. Even if the assertion is true, how does that impact the approval of the compromise agreement in light of the guidelines and parameters under which the Court must operate? *See* discussion § V, p. 890, *supra.* It does not. PepsiCo first complains that the Trustee did not consult PepsiCo to test Banner's representations. The fact is, the Trustee tried. PepsiCo declined to attend any conference because counsel did not care for the setting, insisting that Banner's presence impeded meaningful dialogue. Transcript pp. 1403–04, 1420–21, 1445–46; 1458–60; PepsiCo Memorandum p. 22. Nevertheless, PepsiCo fails to explain why. The Court is of the opinion that had PepsiCo

truly been interested, it would have met with the Trustee to discuss the elements of the settlement, and the strength of the Trustee's position, with or without Banner's presence.

Second, PepsiCo complains that Banner drafted the agreement, filling it full of "traps" which the Trustee did not detect, understand or negotiate away. PepsiCo Memorandum pp. 16–19. Specifically, PepsiCo postulates that:

(a) The Trustee agreed to recitals without regard to their accuracy.

Although PepsiCo cites portions of the Trustee's testimony, this bald statement clearly misrepresents the Trustee's testimony. Additionally, PepsiCo failed to specify how any recitals were inaccurate or prejudicial.

(b) Banner has the right to terminate the agreement after 120 days whereas the Trustee is committed for four years under paragraph 6(d) of the Settlement Agreement.

The Court cannot discern the focus of PepsiCo's point. Although the Agreement appears to be somewhat one-sided, how is this material to the issue at hand? Clearly, the Trustee must have felt that the value of the settlement warranted the burdens under which he was placed.

(c) No interest accrues under the Settlement Agreement until such time as the Court approves it. Upon approval, under the Agreement, Banner shall obtain a letter of credit equivalent to the settlement amount of $6,000,000 plus one year's interest. In the event of disapproval on appeal, Banner takes the letter of credit and "walks away".

Again, the Court is unable to discern the point that PepsiCo is making. The Court cannot envision that a settlement would contain any other provision. Of course, interest should not accrue until the Court approves the Agreement, and PepsiCo has cited no authority for the proposition that the Agreement should provide otherwise. In any case, the Court is well aware that this type of provision reflects standard procedure. PepsiCo's irritation with the provisions in the event of disapproval of the

Agreement upon appeal, is equally strained. Why the estate should garner any benefit in the event of reversal on appeal is beyond imagination.

(d) The Settlement Agreement contains an anti-assignment clause which states that "In the event that any party-in-interest seeks assignment or transfer of any claims [against Banner] ..., the Trustee and the Creditors' Committee agree that they shall oppose any motion filed with the Bankruptcy Court ... unless the consideration offered in exchange for such assignment or transfer is, in the Trustee's business judgment, materially superior to all of the benefits conferred upon the estate by this compromise agreement." The provision is illusory, and the Trustee cannot explain what it means.

Clearly, the determination of whether an assignment is "materially superior" must be assessed on a case-by-case basis. The Trustee's testimony did not indicate that he could not explain what the provision means; he simply cannot assess a non-existent offer in a vacuum.

(e) The Agreement grants a pervasive release to Banner and "its directors, officers, employees, and representatives, subsidiary, parent and affiliated companies, successors and assigns", which represents a surrender of all claims without consideration against Krasney and others. PepsiCo insists that this includes Ulmer and Berne, former counsel for the Debtor, and its partners. At the very least, according to PepsiCo, the provision is ambiguous.

PepsiCo mischaracterizes the testimony of the Trustee and his counsel in connection with this provision. The Trustee specifically stated that he did not intend the provision to cover Ulmer and Berne or its partners. Mr. Bradford testified that the settlement negotiations did not include any discussion pertaining to the effect of the release as to Ulmer and Berne; this testimony did not indicate naivete on the part of Mr. Bradford, but rather is indicative of the intent of this provision of the Agreement.

PepsiCo is further irritated by what it perceives as denial of information to the Creditors by the Trustee. PepsiCo insists that this is unprecedented and without basis under the theory that the Trustee has no attorney-client privilege and no right to shield settlement negotiations from Creditors. Although during the hearing PepsiCo cited Bankruptcy Code § 704(7), in its Brief PepsiCo appears to have retreated from its previous heavy reliance on this provision. Rather, PepsiCo relied on the testimony of Tom Raleigh, Transcript p. 1537, and the circuit court case of *Oswald v. General Motors Corporation (In re General Motors Corporation Engine Interchange Litigation)*, 594 F.2d 1106, 1124 (7th Cir.1979).

▪▪▪ PepsiCo's retreat from § 704(7) is well-considered. Section 704(7) provides that:

The Trustee shall—

(7) unless the Court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party-in-interest.

The Court does not read this provision as denying the attorney-client privilege to the Trustee. In fact, the Court finds PepsiCo's theory illogical and untenable. Taken to the extreme, this theory would enable PepsiCo to compel the Trustee to divulge his entire case in the adversary proceeding against PepsiCo to his opponent. Even PepsiCo's expert admits that in certain circumstances, it is wise to invoke the privilege or shield negotiations from adverse parties which may benefit therefrom. Transcript p. 1553, 1613. As recognized by Mr. Raleigh, each case must be judged individually. Transcript p. 1552. Such is the case here where the adversary proceedings against Banner and that against PepsiCo are closely intertwined, factually and legally. Even PepsiCo does not deny this. Further, PepsiCo has shown proclivity for utilizing information from other legal forays in this forum. Thus, the Court may presume that the information garnered here would be utilized in other litigation. This the Court feels is improper, and the

Court will not be drafted or coerced into filling the role of informant for PepsiCo.

PepsiCo's reliance on *General Motors* in support of the theory that the Trustee cannot withhold information from the Creditors is misplaced. That case is vastly distinguishable from the instant proceeding. In *General Motors*, a class action suit, the circuit court as well as the district court recognized that the settlement negotiations had been irregular in that certain counsel had been excluded from the negotiations and the negotiations may have been held in violation of the District Court's pretrial order. Further, the settlement was reached early in the case, shortly after discovery had commenced, and it was questionable how fully familiar counsel were with the claims in the case. *General Motors*, 594 F.2d at 1128. The class had not even been notified of the pendency of the suit and part of the class would receive nothing under the settlement. *Id.* at 1128–29. Counsel for some of the parties were to receive a large fee for services in the case. *Id.* at 1129, 1130–31. Notably, the Circuit Court specified that its holding was required "under the facts of this case." *Id.* at 1133.

Here, conversely, there is no evidence of damage or prejudice to the creditors or even an intimation of such. *See also, A & C Properties*, 784 F.2d 1377, 1384 (9th Cir. 1986) (Bankruptcy Court's exclusion of evidence regarding negotiations upheld); *Mars Steel Corporation v. Continental Illinois National Bank & Trust Company*, 834 F.2d 677, 684 (7th Cir.1987). The *Mars Steel* court recognized that discovery of settlement negotiations is unusual in ongoing litigation and held that discovery is proper only where a foundation has been laid by adducing evidence from other sources of collusiveness "as in the *General Motors'* case".[48]

## C. Collusion

■ Because the Trustee blocked any inquiry into the settlement process or negotiations, PepsiCo insists that the Court cannot make a finding of non-collusion, citing *GMC*, 594 F.2d at 1124; *In re Del Grosso*, 106 B.R. 165 (Bankr.N.D.Ill.1989); *In re Cardinal Industries, Inc.*, 102 B.R. 991 (Bankr.S.D.OH 1989). Contrary to PepsiCo's argument, however, the Trustee has in fact shown non-collusion. He specifically testified that the agreement embodies all of the terms of settlement and that there are no "side deals". Transcript pp. 61, 883–84, 1104; Plaintiff's Exhibit 4–A, para. 9(b). *See also* footnote 38, *supra*.

On the other hand, PepsiCo has not shown the existence of any facts which support an inference of collusion. *See Jones v. Amalgamated Warbasse Houses, Inc.*, 97 F.R.D. 355, 359 (E.D.N.Y.1982), *affirmed*, 721 F.2d 881 (2d Cir.1983), *cert. denied*, 466 U.S. 944, 104 S.Ct. 1929, 80 L.Ed.2d 474 (1984); *McKerssie v. IU International Corporation*, No. 86–C–1683 (N.D.Ill.1987) (1987 W.L. 14009). PepsiCo has asked the question of whether the settlement negotiations include discussions of "other cases (e.g. *Revco*) in which Banner and the Trustee were interested." PepsiCo Memorandum p. 5. However, PepsiCo adduced no evidence at the trial that Banner or the Trustee have any interest in any other cases. Similarly, PepsiCo surmises that Banner may have agreed to curtail its heretofore lengthy and detailed objections to the Trustee's Fee Applications, *Id.*, but PepsiCo failed to ask the Trustee or Banner if any such agreement exists, or if Banner intends to so limit its objections. In fact, the Court notes that objections have not been curtailed.[49] Although PepsiCo asserts these questions were "foreclos-

---

48. The Trustee has argued that PepsiCo even characterized settlement negotiations as "arms' length" in the *Courtney* litigation. *Banner Industries, Inc. v. PepsiCo, Inc.*, Case No. CIV–85–449–R, PepsiCo's Reply Memorandum in Support of Motion for Summary Judgment filed June 20, 1990 at pp. 7–8.

49. Banner began using an abbreviated form of objections, incorporating its previous arguments by reference, in October, 1989, before negotiations for settlement began. *See,* Document Nos. 1791, 1792; *see also* Transcript pp. 1056–57. In any case, in his testimony, the Trustee specifically disabused any notion that this was a factor in pursuit of the settlement. Transcript pp. 1407–1408.

ed by this record," *Id.*, questions could have been formulated which may have established the record PepsiCo needed. Then again, maybe PepsiCo didn't want to risk getting the "wrong" answers.

There is a presumption of regularity. *Jones*, 97 F.R.D. at 359. *See also, Jones*, 721 F.2d at 885. Collusion is not presumed. *In the Matter of Georgia Paneling Supply, Inc.*, 581 F.2d 520 (5th Cir.) *vacated on other grounds*, 588 F.2d 93 (1978); *Coal Processing*, 578 F.Supp. at 465. An intrusion into the settlement process is justified only where there is some inference of collusion established by evidence presented by the objecting parties. *McKersie, slip op.* at 2–3. This record reflects that the Trustee has certified the basis for the settlement, i.e. the best interest of the estate. Transcript pp. 883–84, 1103–04; Plaintiff's Exhibit 4–A para. 6(g). *See Mashburn v. National Healthcare, Inc.*, 684 F.Supp. 660, 668 (M.D.Ala.1988). Further, the Court can consider the history of this litigation, and its knowledge of and experience with the parties and their counsel. *See Mashburn*, at 668; *Williams v. New Orleans Steamship Association*, Civil Action No. 71–873 (E.D.La.1985) (1985 W.L. 2538); *Wattleton v. Ladish Company*, 89 F.R.D. 677, 685 (E.D.Wis.1981). The *Williams* court recognized that certain factors create a strong presumption against fraud; among those factors are (a) the length of time that the litigation has been pending, (b) the contentiousness of the litigation, (c) the period negotiations have been ongoing. *See also, Wattleton*, 89 F.R.D. at 685. Similar to the observations made by the *Williams* court, this Court is quite familiar with the parties and their counsel. This litigation has been extremely contentious as can be noted by the (i) hotly contested discovery disputes, (ii) Motions to dismiss the Trustee's complaints, (iii) the appeal of this Court's Order on the Motion to Dismiss, (iv) Trustee's Motion to strike the appeal as untimely, (v) the opposition by the Plaintiff to Banner's Motion for reconsideration of the District Court's Order dismissing the appeal, (vi) the Trustee's opposition to Banner's Motion to certify the issues to the Ohio Supreme Court, (vii) the dispute over rights to a jury trial, and (viii) the appeals of this Court's Order on Motion to Strike Jury Demand. In short, nothing has come easy in the Banner adversary. The parties have well-defined and desperate positions. As in the *Williams* case, these factors create a strong presumption against fraud or collusion, which has not been rebutted or even impaired by anything in the record. Such allegations by PepsiCo are simply unsupported and inappropriate.[50] The Trustee having shown that there is no collusion, the burden shifted to the objectors who cannot oppose the settlement by merely demanding more proof. *Del Grosso*, 106 B.R. at 168.

## VIII. CONCLUSION

Once the Trustee shows that there is a reasonable basis for approval of the settlement, the Court has broad discretion. *Matter of Albert–Harris, Inc.*, 313 F.2d 447 (6th Cir.1963); *In re Chicago Rapid Transit*, 196 F.2d 484 (7th Cir.1952). The Court must be hesitant to substitute its own judgment for that of counsel. *Jones*, 721 F.2d at 884; *Cotton v. Hinton*, 559 F.2d 1326 (5th Cir.1977). In the instant case, PepsiCo has elected not to submit direct evidence (other than select excerpts of certain depositions, PepsiCo Exhibit 153), but rather has undertaken to impeach the Trustee's evidence. However, although the Court must give due deference to objections by creditors, objections do not control and the creditors cannot oppose settlement by merely demanding more proof. Regrettably, the perception of PepsiCo's mischaracterization of testimony and case law is viewed by the Court as a tactic to delay approval of this Settlement Agreement. What is clear, is that PepsiCo has its own agenda with Banner, which is reflected not only in the proceedings on the Trustee's Motion for Settlement, but also in the vociferous litigation pending around the country and previous proceedings before this Court. This presents an insufficient basis for the Court to disapprove the settlement.

In order to prevail, the Trustee must succeed not only on his own claims, but he

---

**50.** Footnote deleted for publication.

must also overcome the counterclaims posed by Banner and avoid Banner's liens and/or subordinate Banner's claims. None of these propositions present an easy task. In addition to the other *Drexel* factors, the Trustee has shown that this proposed settlement involves very complex litigation, in which there is substantial uncertainty. Thus, the Court is satisfied that the Settlement Agreement, taken as a whole, is in the best interests of the estate and the Trustee's Motion for Settlement is well-taken. Accordingly, it is

Ordered and Adjudged that all Objections to the Trustee's Motion for Approval of Settlement of Banner adversary are overruled and the Motion for Approval of Settlement is granted. The proposed Settlement Agreement attached to the Trustee's Motion is hereby approved as to form and substance, and the parties are authorized to execute such documentation as is necessary to consummate the Agreement. All claims filed by Banner are disallowed with prejudice.[51] A separate order shall be entered dismissing the *Banner* adversary.

IT IS SO ORDERED.

---

**51.** In light of the probability of appeal of this Order, the disallowance of Banner claims shall be set aside in the event of reversal of this Order on appeal.